UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KENNETH C. SCHREIBER, MARY JANE
LAMBERT, and GEORGE H. VANTINE,
and others on behalf of themselves and a
similarly situated class,

      Plaintiffs,

v.

PHILLIPS DISPLAY COMPONENTS
COMPANY and PHILLIPS ELECTRONIC
NORTH AMERICA CORP., and PHILLIPS
PACE,

      Defendants.

_____/

Case No. 07-10246

Honorable Patrick J. Duggan


## **OPINION AND ORDER**

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on October 16,2007.

PRESENT:      THE HONORABLE PATRICK J. DUGGAN
                       U.S. DISTRICT COURT JUDGE

     Kenneth C. Schreiber, Mary Jane Lambert, George H. Vantine, and those persons

listed in Exhibit A of "Plaintiffs' First Amended Class Action Complaint with Jury

Demand" (collectively "Plaintiffs") filed this lawsuit against Phillips Display

Components Company ("PDC"), Phillips Electronics North America Corp. ("PENAC"),

and Phillips PACE ("PACE")(collectively "Defendants" or "Phillips"), on January 16,

2007, pursuant to Section 301 of the Labor Management Relations Act ("LMRA"), 29

U.S.C. § 185, and Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).  Plaintiffs, on behalf of themselves and a putative class of similarly situated persons, seek a declaratory judgment that Defendants are obligated to provide retiree health care benefits.  In addition, Plaintiffs seek injunctive relief and monetary damages.  On March 13, 2007, Plaintiffs filed an amended compliant asserting the following counts: Count I (Violation of Collective Bargaining Agreement); Count II (Violation of ERISA Union Plan); and Count III (Violation of ERISA Salaried Plan); Count IV (Breach of Fiduciary Duty).

Presently before this Court are the following motions: (1) Plaintiffs' Motion for Preliminary Injunction; (2) Plaintiffs' Motion for Class Certification; (3) Defendants' Motion for Judgment on the Pleadings for Failure to Exhaust Administrative Remedies; (4) Defendants' Motion for Summary Judgment on all Claims by Hourly Plaintiffs; (5) Defendants' Motion for Summary Judgment on all Claims by Salaried Plaintiffs; (6) Plaintiffs' Amended Motion for Preliminary Injunction; (7) Plaintiffs' Motion to Certify Class Action or to Amend Motion to Certify Class; (8) Plaintiffs' Motion for Summary Judgment on Liability Only; and (9) Defendants' Motion to Strike Affidavits Filed by Plaintiffs on August 3, 2007 or, in the alternative, to File Surreply in Opposition to Plaintiffs' Motion for Summary Judgment on Liability Only.  All of these motions have been fully briefed.  This Court held a hearing on the parties' motions for summary judgment on August 9, 2007.[1]

_____

[1]At the hearing, the parties agreed that it would be appropriate to decide the following motions on the briefs and without oral argument: (1) Plaintiffs' Motion for Preliminary

# I.    Factual Background

## A.    Plaintiffs

Plaintiffs Kenneth C. Schreiber ("Schreiber") and Mary Jane Lambert ("Lambert") are purported representatives of a putative class or subclass of former hourly, unionized employees at PDC's manufacturing facility in Ottawa, Ohio.  (*Id.* ¶¶ 23-25.)  Schreiber, Lambert, and this putative class or subclass are referred to collectively as the putative "Hourly Class."  The putative Hourly Class includes both the hourly production workers formerly employed at the Ottawa, Ohio facility, as well as their surviving spouses and/or dependents.  The members of the putative Hourly Class assert that they are entitled to retiree health care benefits through a Collective Bargaining Agreement ("CBA") negotiated on their behalf by the International Brotherhood of Electrical Workers, Local 1654 ("IBEW") and two separate employee welfare benefit plans.

George H. Vantine ("Vantine") is alleged to be the representative of a putative class or subclass of former salaried, non-union employees at PDC's headquarters in Ann Arbor, Michigan.  Vantine and this putative class or subclass are referred to collectively as the "Salaried Class."  Like the members of the putative Hourly Class, the members of the putative Salaried Class include the surviving spouses and/or dependents of the salaried workers formerly employed at PDC's Ann Arbor, Michigan office.  Vantine and the members of the putative Salaried Class claim that they are entitled to retiree health care

---

Injunction (2) Plaintiffs' Motion for Class Certification; (3) Defendants' Motion for Judgment on the Pleadings for Failure to Exhaust Administrative Remedies; (4) Plaintiffs' Amended Motion for Preliminary Injunction; and (5) Plaintiffs' Motion to Certify Class Action or to Amend Motion to Certify Class.

benefits based on two employee welfare benefit plans, which are different from those giving rise to the putative Hourly Class's claims.

Plaintiffs and all members of both putative classes retired on or after July 1, 2001.

### B.    Corporate Structure of Defendants

Koninklijke Phillips Electronics N.V. ("KPNV") is the Neatherlands-based parent company of the Defendants.  PENAC, KPNV's U.S.-based entity, manufactures consumer electronics and other products.  In 1981, PDC, a division of PENAC, began manufacturing cathode ray tubes ("CRTs") for television sets at the Ottawa, Ohio manufacturing facility.  In 1989, PDC moved its national headquarters from Seneca Falls, New York to Ann Arbor, Michigan, where the members of the putative Salaried Class were employed.  Defendant PACE is an unincorporated office of PENAC, and provides administrative services in connection with PENAC-sponsored employee welfare benefit plans, including health benefits.

### C.    Transfer of Ownership and Closure of Ottawa Facility

On or about April 28, 2000, PDC announced that it would be laying off the majority of the employees at the Ottawa facility.  In June 2001, PDC announced that effective July 1, 2001, control of the Ottawa facility would be taken over by LG Phillips Display ("LGP").  The announced take over of the Ottawa facility came after KPNV and LG Electronics Inc., a Korean-based electronics conglomerate, entered into a joint venture forming a new Neatherlands-based corporation to which KPNV sold its CRT production facilities, including the Ottawa facility.  LGP was a subsidiary of the new entity formed by KPNV and LG Electronics.

After the market for CRTs collapsed, LGP announced the closure of the Ottawa facility effective December 31, 2002. On March 15, 2006, LGP filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. LGP converted its Chapter 11 petition to a Chapter 7 proceeding, resulting in the termination of all retiree health benefits on June 1, 2006. (See Deposition Ex. 8.)

**D.     The Putative Hourly Class – the Collective Bargaining Agreement, Plan Documents, and Implementation of Contract Language**

On October 2, 2000, IBEW and PDC entered into a collective bargaining agreement ("2000 CBA") that governed the terms and conditions of employment for the employees at the Ottawa, Ohio facility. The 2000 CBA was effective from October 2, 2000 through September 28, 2003.

During the negotiations for the 2000 CBA, PDC had announced that it intended to transfer the CRT production of the Ottawa, Ohio facility to Mexico. Therefore, the 2000 CBA was negotiated as a plant closing agreement, which guaranteed 800 bargaining unit jobs. Schreiber, Lambert, and the members of the putative Hourly Class were among those guaranteed a job.

In terms of retiree health insurance, the 2000 CBA states:

> **Retired Employees**
>
> Employees who retire on or after January 1, 1998, who are at least age fifty-five (55) and who meet the terms of the existing plan are entitled to purchase health insurance coverage on the same terms and at the same employee contribution levels as in effect for active employees.

(Deposition Ex. 2 ("2000 CBA") at [Def. 000031].) Schedule C of the 2000 CBA

provided the following additional terms regarding "Employee Group Insurance and

Benefit Plans":

> (A) The group insurance in force upon the signature date of this Collective Bargaining Agreement shall remain in full force and effect until September 28, 2003.
> (B) The Company will maintain during the remaining term of this Agreement employee group insurance of the following types: life insurance, non-occupational disability insurance, non-occupational basic medical insurance, non-occupational major medical insurance, and a contributory dental assistance plan as described in the Summary Plan Descriptions distributed to the Union Negotiating Committee on August 3, 1982, as amended . . . .
>
> .    .    .
>
> (D) During the term of this Agreement, the Company shall have the right to amend in any way, the Plans referenced in this Schedule C, except that no such amendment shall diminish the rights prescribed in the Plans as amended by this Agreement, unless it is necessary to avoid the violation of any law or governmental regulation or to meet requirements which the government may impose, so as to obtain the necessary governmental approvals to place these amendments in effect and to continue them in effect.

(*Id.* at [Def. 000063-64].)

Schreiber, Lambert, and the members of the putative Hourly Class have also

proffered two separate summary plan descriptions ("SPDs") – the 2001 Basic/Major

Medical Plan and the 2001 Comprehensive Medical Plan.[2]  (Deposition Exhibits 13 and

14.)  According to the SPDs, PENAC was the sponsor and plan administrator.  The 2001

Basic/Major Medical Plan provided retiree medical coverage to "Early Retirees" who

---

[2]For ease of reference, when the Court cites the 2001 Basic/Major Medical Plan it will use the abbreviation "Bas."  When the Court cites the 2001 Comprehensive Medical Plan it will use the abbreviation "Comp."

retired "between the ages of 55 and 65" and their "eligible dependants" as long as the retiree "had family coverage immediately before retirement." (Bas. at [Def. 000877].)

To be eligible for such medical coverage the Early Retirees must:

> • Have 15 years of eligibility service, as defined in the company's pension plan
> • Be receiving pension benefits or have received a lump sum distribution of the entire pension
> • Be eligible for a company sponsored medical plan immediately prior to retirement

(*Id.*) For those employees retiring after the age of 65, the 2001 Basic/Major Medical Plan provided medical coverage for a $50 deductible. Only retirees hired on or prior to October 1, 1994 could elect to receive medical coverage under the 2001 Basic/Major Medical Plan. Eligibility for the 2001 Comprehensive Plan was identical to 2001 Basic/Major Medical Plan. Both the 2001 Basic/Major Medical Plan and the 2001 Comprehensive Medical Plan provided that retirees would "contribute towards the cost of their own and their dependents' medical coverage." (Bas. at [Def. 000877]; Comp. at [PID 00117].) In addition, both the 2001 Basic/Major Medical Plan and the 2001 Comprehensive Medical Plan provided that these contributions would be automatically deducted from the monthly pension checks of the members of the putative Hourly Class.

Both SPDs for the 2001 Basic/Major Medical Plan and the 2001 Comprehensive Medical Plan provided that coverage will end when a retiree or their covered dependent fails "to pay the required contributions," when the retiree or their "covered dependents become covered under Medicare," when the retiree becomes covered "by another group plan," or when "[t]he plan terminates." (Bas. at [Def. 000878]; Comp. at [PID 00118].)

In addition, both of the 2001 SPDs contained the following reservation of rights clause:

> **Future Of The Plan**
> The Company reserves the right to charge for coverage or to
> end or amend medical coverage for you or your dependents at
> any time subject to the provisions of the applicable collective
> bargaining agreement.

(Bas. at [Def. 000879]; Comp. at [PID 00119].)

Finally, sometime in October 2002 after announcing the closing of the Ottawa facility, LGP prepared document entitled "Implementation of Contract Language – per Ottawa LG.Phillips Plant Closing". (Deposition Exs. 5 and 5A.) This document described four separate retirement scenarios depending on the date of retirement. (*See id.*) More specifically, it instructed employees among the 800 guaranteed bargaining unit jobs what they would need to do to receive pension and medical benefits. (*See id.*)

### E.    The Putative Salaried Class – Plan Documents

Vantine and the members of the putative Salaried Class were not unionized. According to SPDs, PENAC did, however, sponsor and was the named administrator of two retiree medical plans for the members of the putative Salaried Class, the 1999 Phillips Retiree Medical Plan ("1999 Plan") and the 2003 Phillips Retiree Medical Program ("2003 Program"). The 1999 Plan became effective on January 1, 1999. The 2003 Program became effective on January 1, 2003.

Eligibility under the 1999 Plan and the 2003 Program required the employee to retire after his or her 55th birthday, "have at least 15 years of eligibility service, as defined in the company's pension plan," and:

- Begin receiving Phillips pension benefits immediately after [he or she] terminate[s] service (*or have received a lump sum distribution of [his or her] entire pension*)
- [Be] an employee eligible for a company-sponsored medical plan immediately prior to retirement
- [Be] in a group covered by the Phillips Retiree Medical Plan

(1999 Plan at [Def. 001152].)  A retiree's dependents were also eligible to receive benefits under the 1999 Plan and the 2003 Program.  The 1999 Plan and the 2003 Program provided that eligible retirees and their covered dependents "share the cost of medical coverage with Phillips."  (1999 Plan at [Def. 001153]; 2003 Prog. at [Def. 00580].)

Both the 1999 Plan and the 2003 Program stated that medical coverage would end when a retiree or their covered dependent "become[s] ineligible, the group plan terminates," or a covered retiree or their covered dependent fails "to pay the premium when due, whichever happens first."  Furthermore, the 1999 Plan contained the following reservation of rights clause:

> Although the company presently intends to continue the plan indefinitely, Phillips Electronic North America reserves the right to alter any of its provisions, to change the amount of contributions or to terminate all or any part of it, as the company in its sole discretion deems necessary, without prior notice to any covered person.
>
> Any amendment to the plan, change in the amount of employee or dependent contributions or termination of part or all of the plan shall be effected by a written document executed on behalf of the company.
>
> Termination of coverage under the plan will not prejudice any claim originating before the date of such termination.

(1999 Plan at [Def. 001149].)  Except for the second paragraph of the 1999 Plan's

reservation of rights clause, the 2003 Program contained identical language.[3]  (2003 Prog. at [Def. 000574].)

### F.     Termination of Health Care Benefits

As stated above, Schreiber, Lambert, Vantine, and the members of the putative Hourly and Salaried Classes retired on or after July 1, 2001, the day LGP took over ownership of the Ottawa, Ohio facility and Ann Arbor, Michigan office.  After they retired, Schreiber, Lambert, Vantine, and the members of the putative Hourly and Salaried Classes applied for, were approved for, and began receiving retiree health care benefits under one of the above-mentioned plans.  In a letter dated May 10, 2006, Plaintiffs and members of the putative classes were informed that LGP was terminating all retiree medical plans after May 31, 2006.  (*See* Deposition Ex. 8.)

Defendants admit that "individuals employed by PDC, and who retired as PDC employees from the Ottawa Facility or the Ann Arbor Office prior to July 1, 2001, continued to receive benefits in accordance with the terms of the PENAC Group Welfare Plan, including those terms that require that they meet the eligibility requirements and pay all required premiums."  (Dfts.' Answer to Am. Compl. ¶ 94.)  Plaintiffs suggest that the

---

[3]The reservation of rights clause in the 2003 Program provides:
> Although the Company presently intends to continue the program indefinitely, Phillips Electronics North America Corporation reserves the right to alter any of its provisions, to change the amount of contributions, or to terminate all or part of it, as the Company in its sole discretion deems necessary, without prior notice to any covered person.  Termination of coverage under the program will not prejudice any claim originating before the date of such termination.

(2003 Prog. at [Def. 000574].)

transfer of ownership to LGP was the means Defendants used to avoid paying retiree health care benefits. According to Plaintiffs, although LGP took over on July 1, 2001, PENAC remained the plan administrator of the employee welfare benefit plans at issue in this case until 2005 when LGP issued its own plans.

## II.   The Parties' Cross-Motions for Summary Judgment

In their Motion for Summary Judgment on Liability Only, Plaintiffs assert three theories of liability. First, irrespective of whether the welfare benefits vested, Plaintiffs argue that because they applied for and received retiree health care benefits from PENAC, under SPDs that identified PENAC as the plan sponsor and administrator, until January 1, 2005 (Salaried) or July 1, 2005 (Hourly), Defendants are obligated to provide retiree health care under the 1999 Plan, 2003 Program, 2001 Basic/Major Medical Plan, or 2001 Comprehensive Medical Plan. Second, Plaintiffs contend that the 1999 Plan and the 2003 Program provide for vested retiree health care benefits for Vantine and the members of the putative Salaried Class. Finally, Plaintiffs assert that Schreiber, Lambert, and the members of the putative the Hourly Class are also entitled to retiree health care benefits because the language of the 2000 CBA, 2001 Basic/Major Medical Plan, and 2001 Comprehensive Medical Plan provide for vested retiree health care benefits.

Defendants oppose Plaintiffs' motion and bring their own motions for summary judgment arguing that none of the documents referenced by Plaintiffs provide for vested retiree health care benefits. Defendants also contend that Plaintiffs' claims must be dismissed based on their failure to exhaust their administrative remedies. Defendants make their exhaustion arguments in both their motion for judgment on the pleadings filed

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure and their motions for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## A.    Standard of Review

This Court will grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  No genuine issue of material fact exists for trial unless, by viewing the evidence in a light most favorable to the nonmoving party, a reasonable jury could return a verdict for that party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  The moving party bears the burden of informing this Court of the basis for its motion and identifying those portions of the record that establish the absence of a material issue of fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to look beyond the pleadings and designate specific facts showing that a genuine issue exists for trial.  FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 322-24, 106 S. Ct. at 2552-53.  It is not enough that the nonmoving party comes forward with the "mere existence of a scintilla of evidence . . . ," *Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512, or some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).  Rather, the nonmoving party must present significant probative evidence in support of its opposition to the motion for summary judgment. *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th

Cir. 1993).

**B.** **Exhaustion of Administrative Remedies**

As an initial matter, the Court believes that Defendants' argument with respect to exhaustion of administrative remedies must be resolved under the standard of review applicable to motions for summary judgment. Defendants' Motion for Judgment on the Pleadings for Failure to Exhaust Administrative Remedies, filed pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, references materials outside the pleadings in this motion. *See* FED. R. CIV. P. 12(c)(stating that "if, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56"). In addition, Defendants raise the issue of exhaustion in both their Motion for Summary Judgment on All Claims Asserted by Salaried Plaintiffs and Motion for Summary Judgment on All Claims Asserted by Hourly Plaintiffs. Thus, the Court will determine whether there is no genuine issue of material fact entitling Defendants' to summary judgment on the ground that Plaintiffs failed to exhaust their administrative remedies.

Although ERISA does not explicitly require exhaustion, it is well-established that "the administrative scheme of ERISA requires a participant to exhaust his or her administrative remedies prior to commending suit." *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991). ERISA's exhaustion requirement "is applied as a matter of judicial discretion" and "a court is obliged to exercise its discretion to excuse nonexhaustion where resorting to the plan's administrative procedure would simply be

futile or the remedy inadequate." *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 419 (6th Cir. 1998). "The standard for adjudging the futility of resorting to the administrative remedies provided by a plan is whether a clear and positive indication of futility can be made." *Id.*

The purposes behind ERISA's exhaustion requirement are:

> (1) [t]o help reduce the number of frivolous law-suits under ERISA; (2) [t]o promote the consistent treatment of claims for benefits; (3) [t]o provide a non-adversarial method of claims settlement; (4) [t]o minimize the costs of claims settlement for all concerned; (5) [t]o enhance the ability of trustees of benefits plans to expertly and efficiently manage their funds by preventing premature judicial-intervention in their decision-making processes; (6) [t]o enhance the ability of trustees of benefits plans to correct their errors; (7) [t]o enhance the ability of trustees of benefits plans to interpret plan provisions; and (8) [t]o help assemble a factual record which will assist a court in reviewing the fiduciaries' actions.

*Costantino v. TRW, Inc.*, 13 F.3d 969, 975 (6th Cir. 1994)(citations omitted).

Defendants contend that the 2007 Phillips Retiree PPO SPD ("2007 SPD") governs this dispute. Furthermore, Defendants argue that because Plaintiffs failed to exhaust their administrative remedies as required under this SPD, their claims must be dismissed. Even if the 2007 SPD governs this dispute, this Court believes, as Plaintiffs contend, that exhaustion of the 2007 SPD's administrative remedies would be futile. Defendants have repeatedly denied that Plaintiffs are eligible for the retiree health care benefits under the 2000 CBA or any plan. These repeated denials are a "clear and positive indication" that exhaustion would be futile.

In addition, this Court believes that many of the purposes of exhaustion would not

be served if Plaintiffs were required to avail themselves of administrative remedies.  In the case at bar, Plaintiffs' lawsuit is not frivolous, and it is doubtful that requiring exhaustion would make it less adversarial.  Dismissing and requiring exhaustion would only increase the costs to the parties, especially given the extensive filings already submitted by the parties.  Moreover, Defendants are unlikely to "correct their errors" or "interpret plan provisions" in a different manner given their position in this litigation. Finally, development of the factual record in this case would do little to aid the Court in "reviewing the fiduciaries' actions," as Plaintiffs' claims rely substantially on the 2000 CBA and the various plan documents they contend are relevant.[4]

In conclusion, this Court believes that Plaintiffs have satisfied their burden in showing that exhaustion would be futile under these circumstances.  Consequently, the Court will deny Defendants' motion for judgment on the pleadings and their motions for summary judgment as they apply to exhaustion.

### B.      Plaintiffs' First Theory of Liability

Plaintiffs first contend that, "[s]eparate and distinct from any arguments regarding vested benefits or the collective bargaining agreement is the argument that where an employer offers an employee welfare benefit plan pursuant to ERISA, it must offer these benefits to all those who meet the plans eligibility requirements."  (Pls.' Br. In Supp. Mot. Summ. Jdgmt. ("Pls.' Br.") at 7.)  To prevail under this theory, Plaintiffs argue that they

_____

[4]Moreover, Defendants repeatedly argue that the 2000 CBA and all of the plan documents are unambiguous.  Thus, development of a factual record would add nothing to Defendants' arguments.

"need only establish that the Plan exists and that the Plaintiffs meet the terms of eligibility." (Pls.' Rep. In Supp. of Motion for Summ. Jdgmt. at 5.) Furthermore, Plaintiffs contend that when they retired Phillips, the plan sponsor and administrator "accepted each of their applications for retirement and enrollment in the retiree health insurance program." (*Id.*) Thus, according to Plaintiffs, Defendants are required to provide retiree health care benefits under the terms of the plans in existence at the times Plaintiffs retired, because these plans are still in existence.

Defendants contend that Plaintiffs' contention that Defendants breached their fiduciary duties does not apply to "settlor" functions; and thus, even if the plans Plaintiffs claim are still in existence and providing benefits to former Phillips employees who retired on or before June 30, 2001, Defendants did not breach their fiduciary duties by effectively amending the plan to exclude Plaintiffs. Moreover, Defendants assert that to the extent that Plaintiffs contend that the "reservation of rights clauses only permitted Phillips to terminate or amend coverage if it terminated all coverage for all employees of all subsidiaries, unincorporated divisions, unincorporated offices, or any other group of employees located within the United States," Plaintiffs are unable to provide any authority to support this proposition.

To the extent that Defendants argue that Plaintiffs' first theory of liability must fail because they are not eligible for any of the plans they claim are still in existence, this Court believes that Defendants misconstrue Plaintiffs' arguments. Plaintiffs are arguing that Defendants are still providing benefits to former employees of Phillips who retired on or before June 30, 2001 under the same or substantially similar plans as those in existence

at the time of Plaintiffs' retirements. Thus, according to Plaintiffs, Defendants are obligated to provide Plaintiffs, individuals who retired after June 30, 2001 those same benefits. Defendants' failure to do so, Plaintiffs' claim, resulted in a breach of their fiduciary duties under ERISA.

To support this theory of liability, Plaintiffs proffer affidavits of former Phillips employees who worked at the Ottawa and Ann Arbor facilities and who retired on or before June 30, 2001. In their affidavits, these former employees state that they are receiving the same retiree health care benefits from Phillips as those received at the time they retired. (Doc. No. 83, Pls.' Exhibits, Exs. 2-7.) In addition, these former employees provide their health insurance cards, which bear the name of United Health Care, the medical claims administrator of the plans. (*See, e.g.*, *id.*, Exs. 4A-B.) Furthermore, one former employee, Richard Wehri, states that in July 2007 he contacted both United Healthcare and PACE to request a copy of the SPD for his retiree health care benefits. (Doc. No. 83, Pls.' Exhibits, Ex. 2 Wehri Aff. ¶¶ 17-18.) United Healthcare told Mr. Wehri that it did not have any SPDs. (*Id.* ¶ 17.) PACE told Mr. Wehri that it did not have any copy of the SPD for his retiree health care benefits and that he was to refer to the 1993 benefits booklet he had in his possession. (*Id.* ¶ 18.)

While Plaintiffs devote much time and effort in attempting to establish a factual basis for their first theory of liability, they do little to explain its legal basis. In their brief in support of their motion for summary judgment, Plaintiffs cite a number of different cases that are inapposite to their first theory of liability. First, Plaintiffs cite *Lockheed Corp. v. Spink*, 517 U.S. 882, 887, 116 S. Ct. 1783, 1788 (1996) for the proposition that

"Congress adopted ERISA to ensure that if an employee were promised a benefit, he would receive it." (Pls.' Br. at 8.) The sentence in *Lockheed* that this Court believes Plaintiffs are using to support this contention states in pertinent part: "[W]hen Congress enacted ERISA it 'wanted to . . . mak[e] sure that if a worker has been promised a defined pension benefit upon retirement – and if he has fulfilled whatever conditions are required to obtain a *vested* benefit – he actually will receive it.'" *Lockheed*, 517 U.S. at 887, 116 S. Ct. at 1788 (quoting *Nachman Corp. v. Pension Benefit Corp.*, 446 U.S. 359, 375, 100 S. Ct. 1723, 1733 (1980)). Thus, Plaintiffs' citation of *Lockheed* negates their argument that this Court should determine whether Plaintiffs are entitled to benefits irrespective of whether these benefits vested.

Moreover, this Court believes that Plaintiffs' reliance on *Varity Corp. v. Howe*, 516 U.S. 489, 116 S. Ct. 1065 (1996) is also misplaced. Contrary to Plaintiffs' suggestion, the facts in *Varity* involved different circumstances than those in this case. The Supreme Court in *Varity* held that an employer and plan administrator breached their fiduciary duties under ERISA when it "significantly and deliberately" misled its employees, causing the loss of non-pension benefits. *See id.* at 491-95, 116 S. Ct. at 1068-70. Here, Plaintiffs do not offer any evidence that Defendants misled them in terminating their retiree health care benefits, much less that they were "significantly and deliberately" misled.[5]

---

[5]For similar reasons, this Court finds Plaintiffs' reliance on *Krohn v. Huron Mem. Hosp.*, 173 F.3d 542 (6th Cir. 1999) unpersuasive. *See id.* at 552 (holding that the defendant breached its ERISA fiduciary duty when it failed "to provide plaintiff with pertinent information about the availability of long-term disability benefits and by failing to submit her application for disability

Plaintiffs' reliance on *Varity* illustrates another legal weakness in their first theory of liability, namely that they pay little mention to whether Defendants were acting as fiduciaries in transferring the liability for their retiree health care benefits to LGP.  In their brief, Plaintiffs cite 29 U.S.C. § 1104(a)(1)(D), which states that "a *fiduciary* shall discharge his duties with respect to a plan solely in the interests of participants and beneficiaries."  (*Compare* Pls.' Br. at 9 ("ERISA mandates that a *plan administrator* discharge its duties 'in accordance with the documents and instruments governing the plan.'"))  As stated by the Sixth Circuit, "the fact that an action taken by an employer to implement a business decision may ultimately affect the security of employees' welfare benefits does not automatically render the action subject to ERISA's fiduciary duties.  To adopt such a rule would, in effect, erode the well-established principle that employers are free to make decisions that modify, amend, or even terminate their employees' unvested welfare benefits."  *Sengpiel v. B.F. Goodrich Co.*, 153 F.3d 660, 666 (6th Cir. 1998).  In this case, any breach of fiduciary duty by Defendants must come from the decision, by Defendants' parent company, to transfer the assets and liabilities of PDC to LGP.  By being part of a business decision implemented by their parent company, Defendants did not breach an ERISA fiduciary duty when Plaintiffs retiree health care benefits were terminated.  *See id.* at 665-66 (holding that a company's decision to transfer its retiree welfare benefit liabilities is not a breach of an ERISA fiduciary duty.)

**C.  Whether Plaintiffs are entitled to vested retiree health care benefits**

---

benefits to its long-term disability insurer").

ERISA governs both pension plans and welfare benefit plans. It is undisputed that the retiree health care benefit plans at issue in the instant litigation are employee welfare benefit plans as defined by ERISA. *See* 29 U.S.C. § 1002(1)(defining "employee welfare benefit plan"); *see also Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 578 (6th Cir. 2006). "Welfare plans are specifically exempted from vesting requirements to which pension plans are subject." *Sprague v. General Motors Corp.*, 133 F.3d 388, 400 (6th Cir. 1998)(en banc)(citing 20 U.S.C. § 1051(1)). Nonetheless, the parties "by agreement or by private design," as set forth in either a CBA or in the plan documents, may agree to vest a welfare benefit plan. *In re White Farm Equip. Co.*, 788 F.2d 1186, 1193 (6th Cir. 1986). "To vest benefits is to render them forever unalterable." *Sprague*, 133 F.3d at 400.

1.    Vantine and the members of the putative Salaried Class

In addition to their first theory of liability, Plaintiffs contend that Vantine and the members of the putative Salaried Class are entitled to vested retiree health care benefits under the SPDs for the 1999 Plan and the 2003 Program. By failing to provide these vested retiree health care benefits, Plaintiffs assert that Defendants breached their contractual duties under ERISA. (Am. Compl. Count III.) Specifically, Plaintiffs argue that the 1999 Plan and the 2003 Program exhibit "the parties' intent to vest retiree health care benefits" because eligibility for retiree health care benefits is tied to and conditioned on eligibility for vested pension benefits. (Pls.' Br. In Supp. of Mot. Summary Jdgmt. at 14.) Plaintiffs contend that although both the 1999 Plan and the 2003 Program contain reservation of rights clauses, the provisions contradict the provisions under the section of

the plans requiring contributions; thus, Plaintiffs contend that the terms of the 1999 Plan and 2003 Program are ambiguous, allowing the Court to refer to extrinsic evidence.

Defendants first contend that the 1999 Plan and the 2003 Program contain no promises of lifetime medical benefits. Furthermore, Defendants, relying on *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998), argue that in light of the reservation of rights clauses in both the 1999 Plan and the 2003 Program, the Salaried Plaintiffs' "claims are simply without basis."

This Court agrees that *Sprague* controls the Salaried Plaintiffs' claims. In *Sprague*, the Sixth Circuit, *en banc*, stated that "because vesting of welfare plan benefits is not required by law, an employer's commitment to vest such benefits is not to be inferred lightly; the intent to vest 'must be found in the plan documents and must be stated in clear and express language.'" *Sprague*, 188 F.3d at 400. The plaintiffs in *Sprague* argued that the despite express reservation of rights clauses in the SPDs allowing the employer to amend, modify, or terminate the plans, the fact that the SPDs provided that retiree "health coverage would be paid 'at no cost to' them and 'for [their] lifetimes'" made the SPDs ambiguous, allowing the court to resolve the ambiguity by referring to extrinsic evidence. *Id.* at 401. Finding no ambiguity in the SPDs, the *Sprague* court stated:

> As the Third Circuit explained in a similar case, "the promise made to retirees was a qualified one: the promise was that retiree medical benefits were for life provided the company chose not to terminate the plans, pursuant to clauses that preserved the company's right to terminate the plan under which those benefits are provided."

*Id.* (quoting *In re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation*, 58 F.3d 896,

904 n.12 (3d Cir. 1995)).  Subsequent Sixth Circuit cases have clarified that *Sprague*

applies in circumstances where an employer unilaterally provides a retiree benefit

program.  *See Maurer v. Joy Technologies, Inc.*, 212 F.3d 907, 917 (6th Cir. 2000); *UAW*

*v. BVR Liquidating, Inc.*, 190 F.3d 768, 773 (6th Cir. 1999).

Like the SPDs at issue in *Sprague*, the 1999 Plan and the 2003 Program contain

reservation of rights clauses unambiguously reserving the right to amend or terminate the

plan.  For example, the 2003 Program provides:

> Although the company presently intends to continue the plan
> indefinitely, Phillips Electronic North America reserves the
> right to alter any of its provisions, to change the amount of
> contributions or to terminate all or any part of it, as the
> company in its sole discretion deems necessary, without prior
> notice to any covered person.  Termination of coverage under
> the plan will not prejudice any claim originating before the
> date of such termination.

(2003 Prog. at [Def. 000574].)  The 1999 Plan contains identical language.  (1999 Plan at

[Def. 001149].)  These reservation of rights clauses are almost identical to those at issue

in *Sprague*.  Moreover, reservation of rights clauses in the 1999 Plan and 2003 Program

are not rendered ambiguous because of the fact that eligibility for retiree medical benefits

is tied to eligibility for pension benefits.  *See Sprague*, 133 F.3d at 401 ("We see no

ambiguity in a summary plan description that tells participants both that the terms of the

current plan entitle them to health insurance at no cost throughout their retirement and

that the terms of the current plan are subject to change.")  Accordingly, under *Sprague*,

Vantine and the members of the putative Salaried Class are not entitled to vested retiree

health care benefits under either the 1999 Plan or the 2003 Program pursuant to § 502 of

ERISA.

2. <u>Schreiber, Lambert, and the members of the putative Hourly Class</u>

Analysis of the § 301 LMRA and § 502 ERISA claims of Schreiber, Lambert, and the members of the putative Hourly Class is different than that involved for Vantine and the members of the putative Salaried Class because the putative Hourly Class's claims rely on both the 2000 CBA and the relevant plan documents. Because these claims involve a CBA and plan documents, "[i]f the parties intended to vest benefits and the agreement establishing this is breached, there is an ERISA violation as well as a LMRA violation." *Maurer*, 212 F.2d at 914 (citing *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1298 (6th Cir. 1991)). On the other hand, "[i]f a welfare benefit has not vested, 'after a CBA expires, an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to that CBA." *Yolton*, 435 F.3d at 578 (quoting *Bittinger v. Tecumseh Prod. Co.*, 83 F. Supp. 2d 851, 857 (E.D. Mich. 1998)).

To determine whether the parties intended for the retiree health care benefits to vest, courts in the Sixth Circuit apply the principles set forth in *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983). "*Yard-Man* makes clear that courts 'should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent." *Yolton*, 435 F.3d at 578-79 (quoting *Yard-Man*, 716 F.2d at 1479). The Sixth Circuit in *Yard-Man* stated:

> The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion. The court should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with

> the entire document and the relative positions and purposes of the parties.  As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises.

*Id.* at 1480 (internal citations omitted).  "When ambiguities exist, courts may look to other provisions of the document and other extrinsic evidence."  *Yolton*, 435 F.3d at 579 (citations omitted).

In *Yolton*, the Sixth Circuit set out to clarify what is known as the *Yard-Man* inference.  *See Yolton*, 435 F.3d at 579.  This inference comes from part of the *Yard-Man* decision describing "the context of the CBA negotiations."  *Id.*  Specifically, the *Yard-Man* decision provides that "it is unlikely that [retiree] benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations."  *Yard-Man*, 716 F.2d at 1482.  Consequently, "retiree benefits are in a sense 'status' benefits which, as such, carry with them an *inference* that they continue so long as the prerequisite status is maintained."  *Id.*; *see also Yolton*, 435 F.3d at 579 (emphasizing this language).  The Sixth Circuit has held that *Yard-Man* does not create a legal presumption and "does not shift the burden of proof to the employer, nor does it require specific anti-vesting language before a court can find that the parties did not intend benefits to vest.  Rather the *Yard-Man* inference, and the other teachings of the opinion regarding contract interpretation and the consideration of extrinsic evidence, simply guide courts faced with the task of discerning the intent of the parties from vague or ambiguous CBAs."  *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 656 (6th Cir. 1996); *see also Yolton*, 435 F.3d at 578.

Plaintiffs contend that their retiree health care benefits were vested. According to Plaintiffs, the parties' intent to vest can be gleaned from the fact that the 2000 CBA specifically makes eligibility for retiree health care benefits contingent upon eligibility for vested pension benefits. Plaintiffs further argue that an intention to vest is apparent from the 2000 CBA's provisions regarding early retirement, surviving spouse dependents, fixed contribution rates, and continutation of benefits. Finally, Plaintiffs contend that because the 2000 CBA is ambiguous it is proper to look to extrinsic evidence for an intention to vest, and according to Plaintiffs, the extrinsic evidence shows that the parties intended for the retiree health care benefits to vest.

Defendants respond by arguing that the 2000 CBA contains express durational language providing that retiree health care is limited to the term of the 2000 CBA. In so arguing, Defendants assert that the language in the 2000 CBA is more akin to *Bittinger v. Tecumseh Prods. Co.*, 83 F. Supp. 2d 851 (E.D. Mich. 1998), than any of the cases relied on by Plaintiffs. Defendants further contend that even if retiree health care benefits vested under the 2000 CBA, most of the Plaintiffs actually retired after the expiration of the 2000 CBA, eliminating their right to such vested benefits.

This Court believes that the 2000 CBA contains express durational language, unambiguously providing retiree medical insurance for its duration. The 2000 CBA provides that retirees "who are at least age fifty-five (55) and who meet the terms of the existing plan are entitled to purchase health insurance coverage on the same terms and at the same employee contribution levels in effect for active employees." (2000 CBA at [Def. 000031].) Furthermore, the 2000 CBA states:

25

# SCHEDULE C
## Employee Group Insurance and
## Pension Plans

(A) The group insurance in force upon the signature date of this Collective Bargaining Agreement shall remain in full force and effect until September 28, 2003.

(B) The Company will maintain during the remaining term of this Agreement employee group insurance of the following types: life insurance, non-occupational disability insurance, non-occupational basic medical insurance, non-occupational major medical insurance, and a contributory dental assistance plan as described in the Summary Plan Descriptions distributed to the Union Negotiating Committee on August 3, 1982, as amended . . . .

(2000 CBA at [Def. 000063].)  Reading these provisions together, this Court believes that clear import of this language is that PDC, the Company and signatory to the 2000 CBA, agreed to provide retirees "basic" and "major" medical insurance for the duration of the 2000 CBA.  *See Bittinger*, 83 F. Supp. 2d at 860 (holding that similar language in a CBA "is unambiguous in its import" and that "[t]he promise to provide retirement benefits is expressly linked to the duration of the labor agreement").

Furthermore, while Plaintiffs contend that "[t]he retiree health care benefits under the labor agreement are vested," (Pls.' Br. In Supp. of Mot. S.J. at 17), they fail to cite any particular provision of the 2000 CBA in their brief in support of their motion for summary judgment, their reply brief, and their brief in opposition to Defendants' motion for summary judgment which indicates Defendants' intention to provide lifetime retiree medical benefits.  Plaintiffs do, however, rely on several cases to support their argument that retiree health care benefits vested under the 2000 CBA.  Plaintiffs' reliance on

*Golden v. Kelsey-Hayes Co.*, 73 F.3d 648 (6th Cir. 1996) is misplaced. Unlike the CBAs

at issue in *Golden,* 954 F. Supp. 1173, 1186, (E.D. Mich. 1997), which tied eligibility for

retiree health care benefits to eligibility for vested pension benefits, the 2000 CBA in this

case does not condition eligibility for retiree health insurance on eligibility for pension

benefits. (2000 CBA at [Def. 000031].) To make this argument, Plaintiffs seem to be

referring to the SPDs for the 2001 Basic/Major Medical Plan and the 2001

Comprehensive Medical Plan, which do condition eligibility for retiree health insurance

on, among other things, having "15 years of eligibility service, as defined in the

company's pension plan" and "receiving pension benefits or have received a lump sum

distribution of the entire pension." (Bas. at [Def. 000877]; Comp. at [PID 00117].)

Referring to these SPDs, however, would be appropriate only if the 2000 CBA was

ambiguous as to whether retiree health insurance vested. *See UAW v. BVR Liquidating,*

*Inc.*, 190 F.3d 768, 774 (6th Cir. 1999)(finding that an insurance agreement associated

with a CBA was extrinsic evidence). Because this Court does not believe the 2000 CBA

is ambiguous as to whether retiree health insurance vested, the Court need not refer to the

SPDs.

Plaintiffs also argue that the parties intended to vest retiree health insurance benefits

by making reference to "other provisions . . ., including but not limited to the provisions

related to the surviving spouse and dependents, fixed contribution rates, and continuation

of coverage." (Pls.' Br. at 19.) However, Plaintiff does not cite any particular provision

in the 2000 CBA to support this proposition, because there are none. Furthermore, to the

extent that Plaintiffs are relying on the SPDs to make these arguments, such an attempt is

rejected for the reasons stated above with respect to Plaintiffs' *Golden* argument.

Finally, because this Court does not believe that the 2000 CBA is ambiguous as to whether the parties' intended to vest retiree medical insurance, it need not refer to the depositions, exhibits, affidavits, and other extrinsic evidence proffered by either party in support of their claims. *BVR Liquidating, Inc.*, 190 F.3d at 772 ("[A] court should consider extrinsic evidence only when the terms of the contract are ambiguous.") Furthermore, although Plaintiffs refer to the *Yard-Man* inference, this "inference, and the other teachings of the opinion regarding contract interpretation and the consideration of extrinsic evidence, simply guide courts faced with the task of discerning the intent of the parties from *vague or ambiguous* CBAs." *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 656 (6th Cir. 1996)(emphasis added); *see also Yolton*, 435 F.3d at 578.

## IV.  The Parties' Remaining Motions

Because the Court will enter judgment in favor of Defendants, it will deny Plaintiffs' Motion for Preliminary Injunction, Motion for Class Certification, Amended Motion for Preliminary Injunction, and Motion to Certify Class Action or to Amend Motion to Certify Class as moot. For the same reason, the Court will deny Defendants' Motion to Strike Affidavits Filed by Plaintiffs on August 3, 2007 or, in the alternative, to File Surreply in Opposition to Plaintiffs' Motion for Summary Judgment on Liability Only as moot.

## V.  Conclusion

Based on the foregoing analysis, the Court concludes that Defendants are entitled to summary judgment as to all of Plaintiffs' claims. While this is unfortunate for the

retirees, the Court believes that the language of the applicable documents necessitates such a result.

Accordingly,

**IT IS ORDERED**, that Defendants' Motion for Judgment on the Pleadings for Failure to Exhaust Administrative Remedies is **DENIED**;

**IT IS FURTHER ORDERED**, that Plaintiffs' Motion for Summary Judgment On Liability Only is **DENIED**;

**IT IS FURTHER ORDERED**, that Defendants' Motion for Summary Judgment On All Claims Asserted by Hourly Plaintiffs and Defendants' Motion for Summary Judgment On All Claims Asserted by Salaried Plaintiffs are **GRANTED**;

**IT IS FURTHER ORDERED**, that Plaintiffs' Motion for Preliminary Injunction, Motion for Class Certification, Amended Motion for Preliminary Injunction, and Motion to Certify Class Action or to Amend Motion to Certify Class are **DENIED AS MOOT**;

**IT IS FURTHER ORDERED**, that Defendants' Motion to Strike Affidavits Filed by Plaintiffs on August 3, 2007 or, in the alternative, to File Surreply in Opposition to Plaintiffs' Motion for Summary Judgment on Liability Only is **DENIED AS MOOT.**

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
David W. Zoll, Esq.
Lisa M. Smith, Esq.
Greg V. Mersol, Esq.
David A. Posner, Esq.