UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH C. SCHREIBER, MARY
JANE LAMBERT, and GEORGE H.
VANTINE,

        Plaintiffs,

v.                                    Case No. 07-10246
                                    Honorable Patrick J. Duggan

PHILIPS DISPLAY COMPONENTS
CO., PHILIPS ELECTRONIC NORTH
AMERICA CORP., and PACE,

        Defendants.
_____/

## OPINION

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on March 3, 2010.

PRESENT:   THE HONORABLE PATRICK J. DUGGAN
                 U.S. DISTRICT COURT JUDGE

Plaintiffs filed this putative class action lawsuit against Defendants alleging

violations of Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C.

§ 185, and Section 502(a)(1)(B) of the Employee Retirement Income Security Act of

1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).  Plaintiffs seek to represent a class (or

subclasses) of former Philips Display Components Company employees who retired on or

after July 1, 2001.  Plaintiffs seek a declaratory judgment that Defendants are obligated to

provide them with retiree health care benefits.  In addition, Plaintiffs seek injunctive relief

and monetary damages.  This matter was tried before the Court and is now ripe for

resolution.

**Findings of Fact**

**A.    The Parties**

1.      Plaintiffs seek to represent a class (or subclass) of over one hundred hourly employees who worked for Philips Display Components Company ("Philips Display") and then LG Philips Displays USA, Inc. ("LGP") at a facility in Ottawa, Ohio ("Ottawa facility"), and who retired on or after July 1, 2001.  The International Brotherhood of Electrical Workers, Local 1654 ("union") represented the hourly employees for collective bargaining purposes.

2.      Plaintiffs also seek to represent a class (or subclass) of non-union, salaried employees who worked for Philips Display and then LGP primarily in Ann Arbor, Michigan.

3.      Philips Display is a division of Philips Electronics North America Corporation ("PENAC").  Beginning in 1989, Philips Display's headquarters were located in Ann Arbor, Michigan.  (1/13/10 Tr. at 46.)

4.      PENAC manufactures consumer electronic devices and other products. PACE [Philips Access Center for Employees] is an unincorporated office of PENAC that performs day-to-day benefits administration.

5.      Prior to July 1, 2001, Philips Display operated the Ottawa facility where it manufactured cathode ray tubes ("CRTs") for television sets.

**B.    The CBA and Health Insurance Plans**

2

1.     In August 2000, Philips Display and the union began negotiations for a new CBA to cover hourly employees at the Ottawa facility.  A CBA subsequently was executed which was effective from October 2, 2000 through September 28, 2003.  (Jt. Ex. 4.)

2.     In April 2000, prior to the negotiations for the CBA, Philips Display announced plans to close the Ottawa facility.  In response, Philips Display and the union agreed to include a provision in the CBA that guaranteed 800 bargaining unit jobs in the Ottawa facility "for the life of the Agreement."  (Jt. Ex. 4 at 60.)  This provision stated that, if the bargaining unit employment level dipped below this number, affected employees would receive:

> 1. Straight time wages (less any termination pay due under Article XVIII in the Labor Agreement) through the end of the Labor Agreement.
>
> 2. Benefit coverage for up to a maximum of eighteen (18) months or the term of the Labor Agreement, whichever is shorter.

(*Id.*)

3.     The CBA included a provision for retiree health insurance benefits.  (Jt. Ex. 4 at 56.)  This provision stated:

> Employees who retire on or after January 1, 1998, who are at least age fifty-five (55) and who meet the terms of the existing plan are entitled to purchase health insurance coverage on the same terms and at the same employee contribution levels as in effect for active employees.

(*Id.*)

3

4.    The CBA also included a schedule ("Schedule C") relating to Employee

Group Insurance and Pension Plans, which provided in relevant part:

> (A) The group insurance in force upon the signature date of
> this Collective Bargaining Agreement shall remain in full
> force and effect until September 28, 2003.
>
> (B) The Company will maintain during the remaining term of
> this Agreement employee group insurance of the following
> types: life insurance, non-occupational disability insurance,
> non-occupational basic medical insurance, non-occupational
> major medical insurance, and a contributory dental assistance
> plan as described in the Summary Plan Descriptions
> distributed to the Union Negotiating Committee on August 3,
> 1982, . . .
>
> (C) The Pension Plan for Hourly Employees will continue in
> its present form for the life of this Agreement except as
> amended during the 1985 contract negotiations.
>
> (D) During the term of this Agreement, the Company shall
> have the right to amend in any way, the Plans referenced in
> this Schedule C, except that no such amendment shall
> diminish the rights prescribed in the Plans as amended by this
> Agreement, . . .
>
> . . .
>
> (G) No matter concerning the Employee Group Insurance
> Plan or the Pension Plan for Hourly Employees or any
> difference or claim arising thereunder shall be subject to the
> grievance or arbitration procedure but rather shall be
> governed by the terms and conditions of such plans.
>
> . . .
>
> (I) The Company agrees to update the Summary Plan
> Descriptions every three years.

(*Id.* at 121-22.)

4

5.      As relevant to this dispute, Philips Display prepared summary plan descriptions ("SPDs") for the following plans:

•Basic/Major Medical Plan (Jt. Ex. 8)

•Comprehensive Medical Plan (Jt. Ex. 9)

•Philips Retiree Medical Plan (Jt. Exs. 10, 11)

The first and second SPDs applied to health insurance coverage for hourly employees and were effective as of January 1, 2001.  The Philips Retiree Medical Plan SPDs applied to health insurance coverage for salaried employees and were effective as of January 1, 1999, and then January 2003.

6.      The SPDs for the Basic/Major Medical Plan and Comprehensive Medical Plan contain the following eligibility provision, in relevant part:

> As a regular, full-time employee in a group eligible for the
> Plan, you may enroll yourself and your eligible dependents in
> one of the company's medical options after completing 30
> calendar days as an employee.  You are considered full-time
> if you are scheduled to work at least 30 hours per week. . . .

(Jt. Ex. 8 at 1; Jt. Ex. 9 at 1.).

7.      The SPDs for the Basic/Major Medical Plan and Comprehensive Medical Plan set forth the following eligibility requirements for retiree health insurance coverage:

•Have 15 years of eligibility service, as defined in the
company's pension plan

•Be receiving pension benefits or have received a lump sum
distribution of the entire pension

•Be eligible for a company sponsored medical plan

5

immediately prior to retirement

(Jt. Ex. 8 at 15; Jt. Ex. 9 at 14.)

8.      The SPDs for the Basic/Major Medical Plan and Comprehensive Medical
Plan limit eligibility to "regular, full-time employee[s] in a group eligible for the Plan"
who have "complet[d] 30 calendar days as an employee."  (Jt. Exs. 8 and 9 at 1.) The
SPDs define full-time employees as employees scheduled to work at least 30 hours per
week.  (*Id*.)  The SPDs provide that coverage ends when the employee "leave[s] the
company, become[s] ineligible or the plan terminates, whichever happens first."  (Jt. Ex.
8 at 15; Jt. Ex. 9 at 14.)

9.      The SPDs for the Basic/Major Medical Plan and Comprehensive Medical
Plan contain the following provision regarding the "Future of the Plan":

> The company reserves the right to charge for coverage or to
> end or amend medical coverage for you or your dependents at
> any time subject to the provisions of the applicable collective
> bargaining agreement.

(Jt. Ex. 8 at 17; Jt. Ex. 9 at 16.)  The SPDs also state that "[r]etirees who retire on or after
January 2, 1992 will be required to contribute towards the cost of their own and their
dependents' medical coverage" and that coverage will terminate if the required
contributions are not made.  (Jt. Ex. 8 at 15; Jt. Ex. 9 at 14.)

10.    The SPDs for the Philips Retiree Medical Plan provide that employees who
retire after their fifty-fifth birthday can continue to receive medical benefits if they have
fifteen years of eligibility service and:

6

•Begin receiving Philips pension benefits immediately after you terminate service (or have received a lump sum distribution of your entire pension)

•Are an employee eligible for a company-sponsored medical plan immediately prior to retirement

•Are in a group covered by the Philips Retiree Medical Plan

(Jt. Ex. 10 at 3 (emphasis removed); Jt. Ex. 11 at 4.)

11.    The SPDs for the Philips Retiree Medical Plan state the following with respect to the future of the plan:

Although the company presently intends to continue the plan indefinitely, Philips Electronics North America reserves the right to alter any of its provisions, to change the amount of contributions or to terminate all or any part of it, as the company in its sole discretion deems necessary, without prior notice to any covered person.

(Jt. Exs. 10, 11.)

12.    Each of the SPDs for the PENAC plans identify PENAC as the plan sponsor and plan administrator.  (Jt. Ex. 8 at 18; Jt. Ex. 9 at 18; Jt. Ex. 10 at 23; Jt. Ex. 11 at 56.)

C.    **LGP**

1.    In 2001, Koninklijke Philips Electronics, N.V. ("Royal Philips") (PENAC's parent) agreed with LG Electronics ("LG") (a Korean-based electronics manufacturer) to form a new corporation to manufacture television and computer CRTs.  (Jt. Ex. 40.)  This merger, effective July 1, 2001, combined Royal Philips' strength in the television CRT business with LG's strength in the computer CRT business.  (1/13/10 Tr. at 50-51.)  The newly formed corporation was LG Philips Displays Holding B.V. ("LGP Holding") and it combined Royal Philips' and LG's global CRT manufacturing facilities (over 25 factories) and employees (about 36,000).  (Doc. 40-7; Jt. Ex. 40.)  Ownership of LGP Holding was divided equally between Royal Philips and LG.  (*Id.*)

2.    In connection with this joint venture, the Ottawa facility– the only facility in the United States acquired by LGP Holding– was transferred to LG Philips Display U.S.A., Inc. ("LGP").  (*Id.*; 1/13/10 Tr. at 61.)  All Philips Display employees working at the Ottawa facility became employees of LGP as of July 1, 2001.  (Jt. Ex. 41; 1/12/10 Tr. at 83-84.) LGP assumed all ongoing liabilities related to the Ottawa facility, including the existing CBA.  (*See, e.g.,* Jt. Ex. 42.)

3.    LGP Holding's headquarters were located in Hong Kong.  (Jt. Ex. 40; 1/13/10 Tr. at 53.)  Its human resources and finance departments also were located in Hong Kong.  (*Id.*)  Pursuant to the terms of the agreement between Royal Philips and LG, the senior management team for LGP Holding was divided roughly equally between former Philips and LG employees.  (1/13/10 Tr. at 54-55.)  Some new managers came in

from LG's headquarters in Korea to work at the Ottawa facility. (1/12/10 Tr. at 85.)
There were "extreme" differences between the cultures of Royal Philips and LG and LG's
culture eventually was the one LGP followed. (1/13/10 Tr. at 55-56.)

4.     In late June 2001, hourly employees at the Ottawa facility were provided
with documents relating to how the merger would affect employee payroll and benefits.
(Jt. Exs. 42, 43.) With respect to medical benefits, the documents state that "LGP will set
up the same medical plans [employees] currently have with UHC [UnitedHealthCare],"
that claims incurred on or after July 1, 2001 will be paid from a different UHC office than
those incurred before that date, that new medical cards will be issued, and that year-to-
date payments towards deductible and out-of-pocket limits will be transferred to LGP as
of July 1, 2001. (*Id.*) With respect to retiree medical benefits, specifically, one document
states that LGP "will establish retiree medical plans with UnitedHealthcare with the same
provisions as the Philips plans for retirements [sic]." (Jt. Ex. 43.)

5.     In October 2001, LGP sent a memorandum to employees concerning their
submission of United Healthcare claims. (Jt. Ex. 46.) The memorandum indicates that
for claims incurred before July 1, 2001, a blue claim form should be used that shows
"group number 191443." (*Id.*) For claims incurred on or after July 1, 2001, the
memorandum provides that a white claim form should be used with "group number
23677." (*Id.*)

6.     LGP obtained a health plan for employees that "mirrored" the plan
previously provided by Philips Display. (1/12/10 Tr. at 80.) However, due to limited

9

resources and the understanding that the Ottawa facility soon would be moving to Mexico, LGP decided to use the SPDs previously issued by Philips Display instead of issuing its own.  (*Id*. at 80-81.) PENAC remained the Plan Administrator.  (*Id*. at 70-71.) Pursuant to a service agreement, PACE handled health insurance benefits for LGP until January 1, 2006.  (*Id*. at 68-69.)  In December 2005, LGP sent a notice to benefit recipients indicating that it no longer would be using PACE for most services and that LGP's call center instead should be contacted regarding status changes or requests or questions regarding benefits and payroll.  (Jt. Ex. 21.)

       7.     In May 2005, LGP issued its own SPDs for the hourly employees' medical plans.  (Jt. Exs. 18, 19.)  These SPDs were effective July 1, 2005.  (*Id*. at 2.)  LGP subsequently issued its own SPD for the medical plan applicable to salaried active and retired participants, which was effective January 1, 2006.  (Jt. Ex. 20.)

**D.**    **Closing of the Ottawa Facility and LGP's Bankruptcy**

       1.     After the merger, the market for CRTs fell drastically due to gaining popularity of flat panel displays.  (*See* 1/13/10 Tr. at 57-58.)  In response, LGP Holdings decided to close all of the former Philips Display factories, including the Ottawa facility.  (*Id*. at 58.) Prior to the closure, the union met with LGP officials and reached a plant closing agreement titled "Implementation of Contract Language - per Ottawa LG Philips Plant Closing" ("Implementation of Contract Language").  (Jt. Ex. 12.)  Marilyn Horstman, LGP's human resources manager, prepared this document.  (1/12/10 Tr. at 63, 102-03.)  Employees at PACE and Jill McManus, an attorney for Philips, had input into

its preparation.  (*Id*. at 119-20.)

2.     One of the issues addressed in the Implementation of Contract Language document was the date by which employees needed to retire to secure retiree health insurance benefits.  (Jt. Ex. 12.)

3.     The Ottawa facility closed on December 31, 2002.

4.     Each Plaintiff and member of the putative class (or sub-classes) submitted an Application for Pension and Retiree Medical Enrollment Form and retired effective July 1, 2001 or thereafter.  (Jt. Exs. 1, 16, 17.)  The applications bear PENAC's name.  (*Id*.)  Above the signature line on the Retiree Medical Enrollment Form is the following statement, in relevant part: "I understand that the company necessarily reserves the right to end or amend retiree medical coverage for me or my dependents at any time. . . ."  (*Id*.)

5.     Of the putative class of 184 hourly retirees, 107 individuals retired after the CBA expired on September 28, 2003.  (Jt. Ex. 1.)  The remaining 77 individuals retired before the CBA expired.  (*Id.*)

6.     The hourly retirees subsequently received pension benefits pursuant to a PENAC pension plan and health insurance benefits.

7.     LGP filed for bankruptcy on March 15, 2006.  In a letter dated May 10, 2006, LGP informed individuals receiving COBRA and retiree medical benefits that the COBRA/retiree medical plan would be discontinued after May 31, 2006.

8.     Defendants have continued to provide retiree health insurance benefits to individuals who retired from Philips Display before July 1, 2001.

11

E.    **Lawsuit**

1.    In response to the discontinuation of their retiree health insurance benefits, Plaintiffs filed this lawsuit against Defendants on January 16, 2007.  Plaintiffs seek to represent hourly and salaried employees who worked at the Ottawa facility and who retired from the facility after June 30, 2001.

2.    Plaintiffs allege that Defendants are obligated to provide the former hourly employees and their surviving spouses and dependents vested lifetime retiree health insurance benefits.

3.    Plaintiffs further allege that Defendants breached their fiduciary duties in violation of ERISA when they terminated the former hourly and salaried employees (and their surviving spouses and dependents) from a PENAC medical plan.

4.    In early 2007, the parties filed cross-motions for summary judgment.  In an opinion and order dated October 16, 2007, this Court granted Defendants' motion.  The Court concluded that the hourly employees are not entitled to vested retiree health insurance benefits pursuant to the unambiguous terms of the CBA.  The Court further concluded that Defendants did not breach ERISA's fiduciary duties based on the decision to transfer ownership of the Ottawa facility to LGP.  Plaintiffs appealed.

5.    On September 2, 2009, the Sixth Circuit reversed this Court's decision. *Schreiber v. Philips Display Components Co.*, 580 F.3d 355 (6th Cir. 2009). The appellate court concluded that the terms of the CBA in fact are ambiguous and that extrinsic evidence therefore must be considered to determine if the former hourly

12

employees are entitled to vested retiree health insurance benefits. *Id*. at 368. The appellate court also concluded that this Court too narrowly analyzed Plaintiffs' breach of fiduciary duty claim, noting that while Defendants' decision to transfer the Ottawa facility to another company was not a fiduciary one under ERISA, it triggered fiduciary obligations with respect to how Defendants amended or terminated Philips Display's medical plan to exclude Plaintiffs. *Id*. at 372. The Sixth Circuit therefore remanded the matter to the district court.

6.    This Court conducted a bench trial with respect to these issues on January 12, 13, and 25, 2010. The parties have submitted pre- and post-trial briefs, as well as proposed findings of fact and conclusions of law.

## Conclusions of Law

### A.    Applicable Law

1.    ERISA governs pension plans and welfare benefit plans, the latter of which encompasses the retiree health insurance plans at issue in this lawsuit. "Unlike pension plans, 'there is no statutory right to lifetime health benefits.'" *Yolton v. El Paso Pipeline Tennessee Co.*, 435 F.3d 571, 578 (6th Cir. 2006) (quoting *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996)). Nonetheless, parties "by agreement or by design," as set forth in a CBA or plan documents, may agree to vest a welfare benefit plan. *In re White Farm Equip. Co.*, 788 F.2d 1186, 1193 (6th Cir. 1986.) Thus the starting point for determining whether a plaintiff is entitled to vested retiree health insurance benefits is the

13

actual language of the CBA and then the plan documents.[1]

2.       "If a welfare benefit has not vested, 'after a CBA expires, an employer

generally is free to modify or terminate any retiree medical benefits that the employer

provided pursuant to the CBA.'" *Yolton*, 435 F.3d at 578 (quoting *Bittinger v. Tecumseh*

*Prod. Co.*, 83 F. Supp. 2d 851, 857 (E.D. Mich. 1998)). "If a welfare benefit plan has

vested, the employer's unilateral modification or reduction of those benefits constitutes a

LMRA violation." *Id*.

3.       The Sixth Circuit's decision in *UAW v. Yard-Man, Inc.*, 716 F.2d 1476

(1983), sets forth the guiding principles for determining whether the parties to a collective

bargaining agreement intended to vest retiree insurance benefits. Pursuant to these

principles, courts must apply basic rules of contract interpretation to discern the intent of

the parties:

> [T]he court should first look to the explicit language of the
> collective bargaining agreement for clear manifestations of
> intent. The intended meaning of even the most explicit
> language can, of course, only be understood in light of the
> context which gave rise to its inclusion. The Court should also
> interpret each provision in question as part of the integrated
> whole. If possible, each provision should be construed
> consistently with the entire document and the relative
> positions and purposes of the parties. As in all contracts, the
> collective bargaining agreement's terms must be construed so
> as to render none nugatory and avoid illusory promises.
> Where ambiguities exist, the court may look to other words

---

[1]However, as the Sixth Circuit noted in its opinion in this case, plan documents
may be interpreted alongside the CBA where they are incorporated in the CBA.
*Schreiber*, 580 F.3d at 365 n. 12.

and phrases in the collective bargaining agreement for guidance. Variations in language used in other durational provisions of the agreement may, for example, provide inferences of intent useful in clarifying a provision whose intended duration is ambiguous. Finally, the court should review the interpretation ultimately derived from its examination of the language, context and other indicia of intent for consistency with federal labor policy.

*Id*. at 1479-80 (internal citations omitted).

4.    The *Yard-Man* court also expressed an "inference" that retiree welfare benefits vest, noting that "it is unlikely that [such benefits], which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations." *Id*. at 1482. The *Yard-Man* inference, however, does not create a legal presumption that retiree welfare benefits vest and does not shift the burden of proof to the employer or require anti-vesting language to demonstrate that the benefits were not intended to vest. *Golden*, 73 F.3d at 656. Instead, "[w]hen other contextual factors so indicate, *Yard-Man* simply provides another inference of intent." *Yolton*, 435 F.3d at 580. As the *Yard-Man* court expressed regarding the vesting inference:

This is not to say that retiree insurance benefits are necessarily interminable by their nature. Nor does any federal labor policy . . . presumptively favor the finding of interminable rights to retiree insurance benefits when the collective bargaining agreement is silent. Rather, as part of the context from which the collective bargaining agreement arose, the nature of such benefits simply provides another inference of intent. Standing alone, this factor would be insufficient to find an intent to create interminable benefits. In the present case, however, this contextual factor buttresses

> the already sufficient evidence of such intent in the language
> of the agreement itself.

*Yard-Man*, 716 F.2d at 1482.

5.      With respect specifically to the interpretation of durational contract clauses

in CBAs, the Sixth Circuit has held that "[a]bsent specific durational language referring to

retiree benefits themselves, . . . the general durational language says nothing about those

retiree benefits." *Yolton*, 435 F.3d at 581 (citations omitted).

6.      Where the application of basic rules of contract interpretation fails to

resolve any ambiguities, courts may look to extrinsic evidence to determine the parties'

intent. *Yolton*, 435 F.3d at 579 (citations omitted).

7.      Plaintiffs seek to hold Defendants liable pursuant to "a reverse alter ego"

theory.  Pursuant to the alter ego doctrine, a successor is found to be, in reality, the same

employer as its predecessor and is held subject to all the legal and contractual obligations

of the predecessor.  *Howard Johnson Co. v. Detroit Local Joint Executive Bd.*, 417 U.S.

210, 259 n.5, 94 S. Ct. 2236, 2242 n.5 (1974) (citing *Southport Petroleum Co. v. NLRB*,

315 U.S. 100, 106, 62 S. Ct. 452, 456 (1942)).  Thus where a new employer continues the

operations of an old employer and is "merely a disguised continuance of the old

employer"– in other words is the "alter ego" of the old employer– the new employer will

be bound by the old employer's labor agreements.  *NLRB v. Fullerton Transfer & Storage*

*Ltd., Inc.*, 910 F.2d 331, 336 (6th Cir. 1990) (citing *Southport Petroleum Co.*, 315 U.S. at

106, 62 S. Ct. at 456).

16

8.       The test to determine alter ego status is "whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision and ownership." *Yolton*, 435 F. 3d at 587 (quoting *Nelson Electric v. NLRB*, 638 F.2d 965, 968 (6th Cir. 1981)).  ". . . '[N]o one element should become a prerequisite to imposition of alter ego status; rather, all the relevant factors must be considered together.'" *Id.* (quoting *NLRB v. Allcoast Transfer, Inc.*, 780 F.2d 576, 582 (6th Cir. 1986)).  While an intent to evade labor obligations is often found in alter ego cases, the Sixth Circuit has made clear that such an intent is not essential or a prerequisite to finding alter ego status.  *Id.* (citing *Wilson v. Int'l Bhd. of Teamsters, Warehousemen & Helpers of Am., AFL-CIO*, 83 F.3d 747, 759 (6th Cir. 1996)); *see also Allcoast Transfer*, 780 F.2d at 581.  As the court summarized in *Allcoast Transfer*:

> [T]he essential inquiry under an alter ego analysis is "whether there was a *bona fide* discontinuance and a true change of ownership . . . or merely a disguised continuance of the old employer." . . . This essential inquiry does not require [a] find[ing] that an employer intended to evade labor obligations . . . in order to impose alter ego status.  Instead, in deciding whether a successor corporation is really the predecessor corporation by another name merely requires an examination of all the circumstances of the case, and a weighing of all the relevant factors.

780 F.2d at 581 (quoting *Southport Petroleum*, 315 U.S. at 106, 62 S. Ct. at 456).

9.       ERISA sets forth specific fiduciary duties of a welfare plan administrator.  These duties include an obligation to "discharge . . . duties with respect to a plan solely in the interest of the participants and beneficiaries."  29 U.S.C. § 1104.  Additionally,

ERISA provides that a fiduciary must carry out its duties "for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . [and] with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* Yet, "a corporation's fiduciary duties under ERISA do not encompass all of its activities." *United Steelworkers of Am. v. Cyclops Corp.*, 860 F.2d 189, 198 (6th Cir. 1988).

10.    "An employer that also acts as a plan administrator is said to wear 'two hats'" and "[o]nly when the employer acts in its fiduciary capacity must it comply with ERISA's fiduciary duties." *Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660, 665 (6th Cir. 1998). An employer does not engage in a fiduciary act when it decides to amend or terminate a welfare benefit plan. *Id.* (citing *Sutter v. BASF Corp.*, 964 F.2d 556, 562 (6th Cir. 1992)). An employer also does not engage in a fiduciary act when it transfers retiree welfare benefits to another entity. *Schreiber*, 580 F.3d at 369. ERISA, however, imposes obligations on how these actions are undertaken. More specifically, ERISA "provides instructions as to *how* an employer should properly amend or terminate a plan." *Id.* (emphasis in original) (citing 29 U.S.C. §§ 1022, 1023(b)).

**B.    Plaintiffs Fail to Establish that LGP is the Alter Ego of Philips Display**

1.    LGP acquired the Ottawa facility as part of Royal Philips' joint venture with LG. This joint venture did not simply create LGP, but created a new holding company that combined over 25 factories and approximately 36,000 employees that

Royal Philips' CRT division and LG owned world-wide. Additionally, this new company did not simply manufacture CRTs for televisions (as Philips Display previously had done), but added LG's CRT business for computers.

2.      Management of the new company was not identical to Philips Display, but combined managers from LG in Korea and Royal Philips. LGP, unlike Philips Display and PENAC, was managed through its headquarters in Hong Kong. According to Jeffrey Johnson, who was employed as Philip Display's and then LGP's Vice President of Strategic Planning and Business Development, the culture of the new company was extremely different as well.

3.      In summary, while the new company, like Philips Display, continued to manufacture CRTs, its business operation was greatly expanded to include new facilities and employees and a broader focus (CRTs for computers). Management and supervision changed, as an equal number of managers were brought in from LG's Korean operation and its headquarters were located in Hong Kong. PENAC had no role in LGP Holding's or LGP's operations and Philips Display ceased operations completely.

4.      For these reasons, the Court cannot find that LGP was the alter ego of PENAC or Philips Display.

**C.      Plaintiffs Lacked Eligibility for PENAC Retiree Health Insurance Benefits**

1.      Before addressing whether the CBA and plan documents evidence an intent to vest retiree health insurance benefits, the Court finds it necessary to address whether Plaintiffs even satisfy the eligibility requirements for retiree health insurance pursuant to

19

the language of those documents.

2.    The CBA simply provides that "[e]mployees who retire on or after January 1, 1998, who are at least age fifty-five (55) *and who meet the terms of the <u>existing plan</u>* are entitled to purchase health insurance coverage on the same terms and at the same employee contribution levels as in effect for active employees." (emphasis added.)  The Court interprets "the existing plan" in this provision to mean PENAC's health insurance plans for active hourly employees, not its pension plan.

3.    To meet the terms of the existing plans, the SPDs for PENAC's Basic/Major Medical Plan and Comprehensive Medical Plan state that an individual must: (1) have reached fifty-five years of age; (2) have fifteen years of eligibility service, as defined in the company's pension plan; (3) be receiving pension benefits or have received a lump sum distribution of the entire pension; and (4) be eligible for a company sponsored medical plan immediately prior to retirement.

4.    When they retired from LGP, Plaintiffs were at least fifty-five years of age, had at least fifteen years of eligibility service (which included their years of service with Philips Display's predecessor (GTE Sylvania), Philips Display, and LGP), and were eligible for pension benefits.  Plaintiffs, however, were not eligible for a PENAC sponsored medical plan immediately prior to their retirement because they were not full-time Philips Display employees (as the SPDs' eligibility provision requires).  Plaintiffs ceased being Philips Display employees as of July 1, 2001, when the Ottawa facility was conveyed to LGP.  Further, the SPDs specifically provide that coverage under the group

20

insurance plans ends when employees "*leave the company*, become ineligible or the plan terminates, whichever happens first." (emphasis added.)

5.      In comparison, the SPD for the PENAC pension plan states that, even if individuals leave the company, they are eligible for pension benefits if they have "complete[d] at least five years of eligibility service" and in that case they "are entitled to a vested pension."  (Jt. Ex. 13 at 2.)  As the SPD later states, "once you have five years of eligibility service, you are fully vested.  This means you have a non-forfeitable right to a pension – even if you leave the company before retirement age."  (*Id*. at 11.)

6.      Because LGP's retired hourly employees did not satisfy the eligibility requirements for PENAC's health insurance plans, pursuant to the plain language of the SPDs for the plans, the Court does not believe that Defendants were obligated to continue maintaining Plaintiffs' retiree health insurance coverage.

**D.      Alternatively, There is no Evidence of an Intent to Vest Plaintiffs' Retiree Health Insurance Benefits**

1.      The Sixth Circuit rejected this Court's conclusion that the durational provisions in the CBA evidenced a lack of intent to vest retiree health insurance benefits and concluded that the CBA is ambiguous.  In reaching this decision, however, the appellate court did not identify language in the CBA evidencing an intent to vest those benefits.  Plaintiffs also have not identified such language.  As indicated in the previous section, this Court interprets the CBA as referring to the health insurance plans and not the pension plan when it promises retiree health insurance coverage for employees who

21

are at least fifty-five years of age and "who meet the terms of the existing plan . . ." Therefore, unlike Plaintiffs, the Court does not interpret the CBA itself as tying eligibility for a pension plan to eligibility for retiree health insurance benefits. As the *Yard-Man* court indicated, the inference that retiree welfare benefits vest, "standing alone," is "*insufficient to find an intent to create interminable benefits*."

       2.      The SPDs do tie eligibility for retiree health insurance benefits to eligibility for a pension. However, unlike the SPDs in *Yolton* and other cases where the courts found tying provisions persuasive, the SPDs in this case do not set forth pension eligibility as the *only* requirement for retiree health insurance benefit eligibility. This Court is not convinced that an intent to vest retiree health insurance benefits can be inferred where pension eligibility is one of several eligibility requirements.

       3.      Contrary to Plaintiffs' interpretation, the PENAC SPDs– unlike the plan documents analyzed in *Yard-Man*, *Maurer v. Joy Technologies, Inc.*, and *Noe v. Polyone Corporation*– do not promise coverage at some date possibly beyond the term of the CBA by promising retirees certain coverage once they become eligible for Medicare. *See Yard-Man*, 716 F.2d at 1481 (finding provision promising that the company will pay the full cost of retiree health insurance once a retiree reaches age sixty-five suggestive of an intent to vest as employees were eligible to retire at age fifty-five); *Maurer*, 212 F.2d at 918 (inferring an intent to vest based on provision promising certain benefits until Medicare eligibility at age sixty-five and fact that employees were permitted to retire at age fifty-five); *Noe*, 520 F.3d at 561 (finding vesting based on provisions promising

22

certain benefits once retirees turned sixty-five years of age where employees were eligible to retire at age fifty-five). Instead, the PENAC SPDs refer to Medicare only to discuss the priority of coverage and coordination of coverage for employees based on their age at retirement. That is, the SPDs state that the company plan is the primary plan for individuals retiring before age 65 who are not covered by Medicare and that "[i]f you retire on or after your 65th birthday . . . [b]oth the Comprehensive and Basic/Major Medical plan will coordinate benefit payments with Medicare when you reach age 65 and are retired." (*See, e.g.*, Jt. Ex. 8 at 3, 15.)

4.      The SPDs clearly reserve the company's "right to charge for coverage or to end or amend medical coverage . . . at any time . . ." (Jt. Ex. 8 at 17; Jt. Ex. 9 at 16.) While the SPDs make this subject to the provisions of the applicable CBA, the only limitation set forth in the CBA is that group insurance "remain in full force and effect until September 28, 2003." (Jt. Ex. 4 at 121.)

5.      Defendants were not a party to the Implementation of Contract Language agreement. Therefore this document is not binding on Defendants and does not evidence whether they intended Plaintiffs' retiree health insurance benefits to vest.

6.      It is unclear who approved pension and retiree health insurance applications that LGP employees submitted to PACE.[2]  The evidence indicates that, at the time, PACE

---

[2]Pursuant to the CBA and the SPD for the PENAC pension plan, hourly retirees who already completed five years of eligibility service with Philips Display remained eligible for a PENAC pension even though they left Philip Display's employ. It therefore makes sense that, upon their retirement, LGP hourly retirees completed applications for a

was administering benefit matters for LGP pursuant to a service agreement. Although PACE is named as a defendant in this matter, it was not obligated to provide any benefits to Plaintiffs contractually or otherwise. Moreover, if retiree health insurance benefits did not vest, those benefits subsequently could be terminated regardless of whether Defendants or LGP initially approved Plaintiffs' receipt of those benefits.

7.    The Court is not convinced that hourly employees who retired from *LGP* are entitled to vested benefits because Defendants continued to provide retiree health insurance benefits to individuals who retired from *Philips Display* before the Ottawa facility was transferred to LGP.

8.    There is no evidence that Defendants or their representatives informed Philips Display or LGP employees, orally or in writing, that retiree health insurance benefits were vested or guaranteed for life. Three former Philips Display employees, who represented the union in collective bargaining with the company, testified that they believed retiree health insurance benefits were vested for life. (1/12/10 Tr. at 46, 99-100; 1/13/10 Tr. at 19.) However, there was no testimony explaining the basis for their belief

---

PENAC pension and that any determinations regarding eligibility for a pension would be made by PACE on behalf of PENAC. The continued use of PENAC pension applications could explain the continued use of PENAC Retiree Medical Enrollment forms. Equally plausible are the explanations provided for LGP's continued use of PENAC's SPDs (i.e. limited resources and the expected closure of the Ottawa facility). The Court also believes that paying contributions for the cost of retiree health insurance coverage from some retirees' PENAC pension checks does not necessarily suggest that the insurance coverage was through a PENAC plan. Arrangements easily could be made to withhold the cost of a retiree's health insurance coverage under an LGP plan from his or her PENAC pension.

and therefore their testimony does not persuade the Court that the union *and company* agreed to vested retiree health insurance benefits.

9.      Philips Display and then LGP employee Becky Goedde testified that she believed from what she observed that Philips Display treated retiree health insurance benefits as lifetime benefits.  (1/12/10 Tr. at 65.)  Ms. Goedde, however, did not explain what specifically led her to reach this conclusion and she did not represent the company in collective bargaining.

10.      Ms. Goedde's belief is contrary to the warning in the SPDs and the Retiree Medical Enrollment Form that employees completed when they retired which stated that the company reserved the right to terminate or amend retiree health insurance benefits "at any time."

11.      For the above reasons, the Court concludes that hourly retiree health insurance benefits were not vested.

**E.      Plaintiffs' Breach of Fiduciary Duty Claim**

1.      On remand, Plaintiffs claim that Defendants breached their fiduciary duties under ERISA by failing to comply with ERISA procedures when Plaintiffs were terminated from PENAC's medical plans.

2.      Based on this Court's finding that, under the plans' existing eligibility requirements and termination provision, Plaintiffs no longer were eligible for PENAC's medical plans when they became LGP employees, the Court concludes that the plans did not need to be amended or terminated to exclude Plaintiffs from coverage.  Therefore, to

25

the extent Plaintiffs contend that Defendants breached their fiduciary duties by failing to follow ERISA procedures as to *how* a plan is amended or terminated, their claim fails.

3.      To the extent Plaintiffs contend that Defendants breached ERISA's fiduciary duties by failing to notify them that they were being terminated from PENAC's health plans, this claim also fails.

4.      Plaintiffs received health benefits pursuant to the PENAC plans before LGP acquired the Ottawa facility.

5.      When LGP acquired the Ottawa facility on July 1, 2001, Plaintiffs became LGP employees.  Before that occurred, Plaintiffs received an announcement from Philips Display attempting to answer questions regarding the effect of the transfer on such matters as benefits.  This announcement stated that when the facility is transferred to LGP, LGP "will set up the same medical plans you currently have with [UnitedHealthcare]" and "will establish retiree medical plans with UnitedHealthcare with the same provisions as the Philips plans for retirements [sic]."  A memorandum sent to LGP employees on October 15, 2001, reflected that different group numbers applied to claims incurred before and after LGP took over the Ottawa facility.

6.      Based on these communications, the Court finds that Plaintiffs had actual knowledge in mid-2001 that their health insurance benefits would be transferred from a PENAC plan to a LGP plan when LGP gained control of the Ottawa facility.

**Summary**

This Court concludes that Plaintiffs did not satisfy the eligibility requirements for

26

coverage under PENAC's health insurance plans because they were not employees of PENAC or Philips Display when they retired, but instead were LGP employees.  As a result, Defendants were not obligated to provide continuing health insurance benefits to Plaintiffs and did not violate ERISA when those benefits were terminated in 2006. Alternatively, the Court finds no evidence of an intent to vest retiree health insurance benefits and, therefore, Plaintiffs' benefits were lawfully terminated.  Lastly, Plaintiffs' claim that Defendants breached their fiduciary duties in violation of ERISA is time-barred, as they were informed in mid-2001 that their health insurance benefits would be transferred to  an LGP plan when LGP took control of the Ottawa facility.

                                        s/PATRICK J. DUGGAN
                                        UNITED STATES DISTRICT JUDGE

Copies to:
David W. Zoll, Esq.
Lisa M. Smith, Esq.
Gregory V. Mersol, Esq.
Todd A. Dawson, Esq.

27